674 P.2d 1036

**R.T. NAHAS CO., a California corporation, Robert T. Nahas and Eva C. Nahas, Plaintiffs-Respondents,**

v.

**Jay H. HULET and Gertrude Hulet, husband and wife, Defendants-Appellants.**

Nos. 14227, 14325.

Court of Appeals of Idaho.

Dec. 27, 1983.

Rehearing Denied Feb. 6, 1984.

38

Philip A. Peterson and Terrence R. White, of Yost, White, Ahrens & Peterson, Nampa, for defendants-appellants.

Robert J. Koontz, of Elam, Burke, Evans, Boyd & Koontz and James W. Kiser, Boise, for plaintiffs-respondents.

WALTERS, Chief Judge.

Jay and Gertrude Hulet (hereinafter referred to as Hulet) appeal from a judgment recognizing the prior right of R.T. Nahas Co. and Robert and Eva Nahas (hereinafter referred to as Nahas) to divert winter runoff water from Sinker Creek, a tributary of the Snake River, located in Owyhee County, Idaho. Hulet presents ten issues which can be consolidated into six contentions, as follows. (1) Hulet's motion to dismiss, for failure to name the Department of Water Resources as a party, was improperly denied. (2) Several findings of fact concerning the size of Nahas' appropriation are not supported by substantial competent evidence. (3) The award of costs to Nahas against Hulet in the amount of the fee for Nahas' expert witness was improper. (4) The court should not have ordered that Hulet be responsible for costs incurred in the future by Nahas, in enforcing Nahas' water rights. (5) Nahas' appropriation for livestock water rights should not have been recognized because there was no physical diversion of water. (6) Neither actual nor punitive damages should be awarded in this case.

Additionally, Nahas seeks an award of attorney fees for representation on this appeal. We affirm the judgment of the court below in part, modify in part and remand for additional findings. We also deny recovery of attorney fees, on appeal, by Nahas.

The following facts are undisputed. In 1969, Nahas purchased over 1,000 acres of ranch land. On the land was a lake which was filled by means of a diversion from Sinker Creek and from which was pumped water for irrigation of a small part of the ranch. Although Nahas' predecessor in interest had applied for licensed water permits for diversion to the lake and for pumping from it, it appears that these permit rights were never perfected. Nahas based his claimed irrigation water rights on the constitutional method of appropriation—diversion and application to beneficial use. From the time Nahas purchased the ranch, he filled his lake by diverting winter runoff waters from Sinker Creek. During the summer months, Nahas diverted water from Sinker Creek, to the extent of previously decreed water rights acquired by his predecessors in interest, for part of his irrigation needs and he pumped water from the lake to satisfy the remainder of his irrigation needs. When Sinker Creek dried up, usually in July of each year, all of his irrigation needs for the remainder of the irrigation season were met by pumping water from the lake.

In 1976, Hulet completed construction of a dam on Sinker Creek, upstream from Nahas' lake. This dam was designed to catch and store water from Sinker Creek for Hulet's use. Hulet's dam was built pursuant to a water license which recited a priority date of October 28, 1975. Following completion of his dam, Hulet began storing all winter runoff water for his own use, depriving Nahas of winter runoff with which to fill his lake. Nahas brought suit to quiet title to his water rights, requesting that Hulet be enjoined from interfering with his water rights and asking for an award of costs, attorney fees and punitive damages. The parties agreed to bifurcate the trial, with the issue of damages to be tried later. After a court trial on the first issue, i.e., the water rights, a judgment was entered in favor of Nahas. The judgment was certified for appeal pursuant to I.R. C.P. 54(b) and Hulet appealed.

**40**

## I. MOTION TO DISMISS

First, we consider whether the refusal of the trial court to dismiss the action,[1] for failure to name the Department of Water Resources as a party, was error. Idaho Code § 6–401, relating to quiet title actions, was amended after the trial in this case, but before the court had entered its findings of fact, conclusions of law and judgment. The amendment states:

> [A]ll actions to adjudicate water rights and obtain a decree as to water source, quantity, point of diversion, place of use, nature of use, period of use, and priority as against other water users *shall be brought* under the provisions of chapter 14, title 42, Idaho Code. [Emphasis added.]

1981 Idaho Sess.Laws ch. 265, § 1, p. 561. Section 2 of the same enactment amended I.C. § 42–1401 to require that the director of the Department of Water Resources shall be named as a defendant in all suits to adjudicate water rights. *Id.* at 562. These enactments took effect immediately. *Id.* at 565.

Hulet argues that this legislation was a change in procedure rather than a change in substantive rights. He contends that these amendments should be applied to all cases which had not been decided when the amendments took effect, including the case at bar. We disagree and conclude that no error occurred when the court denied Hulet's motion to dismiss.

■ Hulet moved to dismiss the action before trial was held. At the hearing on his motion, Hulet argued that the Department of Water Resources should resolve the competing claims of water rights. However, at that time, I.C. § 42–1401 simply provided that the district court *may request* the Department of Water Resources to examine a water system and report on *proposed* findings concerning water rights. *See* I.C. § 42–1401 (1977). This statutory language obviously does not deprive the district court of subject matter jurisdiction. By using the word "may," the Legislature granted to the district courts discretion to seek the department's assistance in resolving competing claims to water rights, if the court so desired. Even if the court did request that assistance, there was no requirement that the department be named as a party in order to accommodate that request. We conclude that, at the time the motion was made, the court was not required to name the Department of Water Resources as a party to the action nor to dismiss the action if the department was not made a party.

■ Hulet's reliance on an amendment which took effect later is misplaced. Hulet did not renew his motion to dismiss after the amendment took effect; therefore, the question whether the trial court should have granted a motion to dismiss when a post-trial amendment took effect was not properly raised before the district court and is not properly before this court on appeal. *E.g. W.F. Construction Company, Inc. v. Kalik,* 103 Idaho 713, 652 P.2d 661 (Ct.App. 1982); *accord Gemkist Farms, Inc. v. Bolen,* 102 Idaho 906, 643 P.2d 1076 (Ct.App.1982) (failure to object to court's action in appointing a master waived the question of propriety of the action).

## II. SIZE OF APPROPRIATION

Next we consider whether certain findings of fact concerning the size of Nahas' appropriation of water for diversion to his lake are correct. If the findings of fact of the trial court are supported by substantial, competent, though conflicting, evidence, those findings will not be disturbed on appeal. I.R.C.P. 52(a).

■ The district court found and adjudged that Nahas had a "superior" right to a quantity of water up to 729 acre-feet but not greater than the capacity of his unnamed lake. In his attack upon this finding Hulet first argues that the award should have been reduced by the amount of water which Nahas would receive from his sum-

---

1. The ruling of the court, denying the motion to dismiss, is not included in the record submitted to us on this appeal; however both parties recognize that the court did in fact, at some time, deny the motion.

mer irrigation water rights, which he estimates to be 649 acre-feet. However, evidence presented at trial supports the court's finding. Evidence was submitted that Nahas was irrigating 140.3 acres. 17.5 of those acres could not be irrigated from Nahas' lake. Of the remaining 122.8 acres, 59 acres could be irrigated only from the lake; 63.8 acres usually received half of its irrigation from the lake and half from Nahas' rights to summer flows of Sinker Creek. Moreover, evidence was presented to show, and the court found, that Sinker Creek is an unreliable source of water, and, during a dry year, there might be no summer flows to divert for irrigation. In that event, the court found, Nahas would provide all irrigation water from his lake, which would reduce the water level of the lake more than usual and require the diversion of a larger amount of runoff water to fill the lake to capacity during the following winter. The court determined that, in such a case, Nahas would have supplied from the lake 5 acre-feet of water per acre to all 122.8 acres, thereby using 614 acre-feet of water. The court recognized Nahas' maximum beneficial use of 614 acre-feet and, therefore his prior right to divert up to that amount of water, plus an allowance (explained more fully below) of 115 acre-feet for evaporation, from winter runoff flows of Sinker Creek, to store in his lake for irrigation. Substantial, competent evidence therefore supports the court's finding that Nahas was entitled to 729 acre-feet, or to such lesser amount as would fill his lake to capacity.

Hulet also argues that 450 acre-feet is the maximum diversion of winter runoff flows to which Nahas is entitled. Testimony at trial indicated that the pumps which drew irrigation water out of the lake could lower the water level by 10 feet, and that usually the water level is drawn down 6 to 8 feet during an irrigation season. Nahas' expert witness testified that, from the topography, he would estimate that the lake varied from 55 acres in surface area when full, to 35 acres when the lake was drawn down 10 feet. He then estimated the volume of water used in drawing the lake down 10 feet, to be 450 acre-feet, based upon an average surface area of the lake of 45 acres. Hulet argues that this establishes the maximum amount of water removed from the lake, and, therefore, the maximum diversion of winter runoff flows to fill the lake to capacity. However, the testimony of witnesses, including Nahas' expert's estimate of water historically pumped from the lake, established Nahas' prior use of *up to* approximately 750 acre-feet. This evidence is also adequate to support the court's finding that Nahas was entitled to 729 acre-feet.

■ Hulet further contends that the amount of water which the court allowed Nahas to divert is more than the amount which Nahas is able to put to beneficial use. Hulet argues that Nahas needs less water because he uses sprinklers, a more efficient means of application of water to land, rather than flood irrigation. Nahas' expert witness did agree that sprinkler irrigation is more efficient than flood irrigation. However, he also testified that the amount of water required for irrigation varied depending upon the type of crop to be irrigated, the slope of the land and the porosity of the soil. He further testified that alfalfa, which Nahas was growing, was a high water-use crop, and that, under *ideal* conditions, 3.5 acre-feet of water per acre would be required to produce a good stand of alfalfa. The record indicates that Nahas' land is not flat and has porous soil. Hulet presented no evidence to the contrary. The court found that 5 acre-feet of water per acre was "reasonable and essential considering [Nahas'] soils, land and climate." Such a finding is supported by the evidence and is not clearly erroneous. This finding will not be disturbed on appeal.

■ Hulet also asserts that the court should not have added the amount of water necessary to compensate Nahas for water lost through evaporation from his lake, because evaporation is not a beneficial use. However, a reasonable loss of water through evaporation or seepage is allowed. *Hidden Springs Trout Ranch v. Hagerman Water Users, Inc.,* 101 Idaho 677, 619 P.2d

1130 (1980). Nahas' expert testified that the amount of water necessary to compensate Nahas for evaporation, based on records of a local University of Idaho Experiment Station would be 2.5 feet per acre of lake surface area during each summer season. That witness assumed an average lake surface area of 45 acres, resulting in an estimated evaporation loss of 115 acre-feet. In further testimony, which was designed to show that the amount of evaporation loss should be added to the amount of water which would actually be applied to the fields to find the total amount of water to be diverted, the witness rounded that number off to "about one hundred acre-feet." The court found that Nahas' lake had a reasonable evaporation loss of 115 acre-feet per year. Substantial competent evidence supports this finding.

Between Hulet's dam and Nahas' point of diversion, the natural watershed and several springs feed Sinker Creek, increasing its flow. Hulet argues that the trial court should have considered this "natural recharge" factor in determining whether he must release water, and how much water to release, from his dam. Hulet contends that the obligation to release water cannot be determined and quantified unless the amount of "recharge" water available to fill Nahas' right is also determined. We believe Hulet has raised a valid point of inquiry, at least to those seasons in which 729 acre-feet would not entirely fill Nahas' lake.

Upon this issue the record is unclear in two respects. First, the evidence is uncertain as to (a) the true quantity and (b) the dependability of the flow of water in Sinker Creek resulting from natural recharge below Hulet's dam and above Nahas' point of diversion to his lake. Second, the record is not clear on the extent to which the court considered such recharge. As noted in part V below, the court found that 12 miner's inches of water in Sinker Creek was needed for Nahas' stock watering purposes in the winter months, below Nahas' diversion point. The court found that this water right was satisfied by the recharge. However, the court did not make a finding as to whether the recharge was limited to this quantity.

■ In our view, if the additional flow in Sinker Creek resulting from natural recharge in excess of 12 inches, is dependable enough to predicate a "water right" upon that flow, then it should be considered in determining the amount Hulet must release at his dam in order to satisfy Nahas' prior right. Hulet should receive a "credit" for any such additional dependable flow. Upon remand, the trial court should make a finding in this regard and, if appropriate, amend the judgment accordingly.

## III. AWARD OF COSTS INCLUDING EXPERT WITNESS FEE

■ Following the trial, the court awarded costs to Nahas, including a fee incurred for Nahas' expert witness, a hydrologist and geologist. Hulet objected to the inclusion of the witness fee as a cost, and a hearing on the objection was held pursuant to I.R.C.P. 54(d)(6). The court denied Hulet's motion to disallow costs, expressly finding:

> [T]hat the costs of [Nahas' expert] were (1) actually incurred and paid; (2) that these costs were clearly necessary and were reasonably incurred, and that [his] testimony was not only critical but was of preemptive importance and value to the court in the determination of this matter; and (3) that justice demands that these exceptional costs should be assessed against [Hulet] pursuant to I.R.C.P. 54(d)(1)(D).

I.R.C.P. 54(d)(1)(D) provides:

> Additional items of cost not enumerated in, or in an amount in excess of [costs allowed as a matter of right] listed in subparagraph (C), may be allowed upon a showing that said costs were necessary and exceptional costs were reasonably incurred, and should in the interest of justice be assessed against the adverse party. The trial court, in ruling upon objections to such discretionary costs ... shall make express findings as to why such

specific items . . . should or should not be allowed.

Hulet suggests that it is unfair to allow recovery of extraordinary costs in actions to adjudicate water rights. We find no merit to this argument. Rule 54(d)(1) does not indicate any limitations, as to the type of actions or costs, in its application. We are unpersuaded that the trial court abused its discretion in allowing recovery of the expert witness fee as a cost.

## IV. PROPRIETY OF AWARDING THE COST OF THE WATERMASTER

Hulet next contends the trial court erred in ordering that Hulet be responsible for the cost of a watermaster to enforce Nahas' water rights. He argues that such an order contravenes the statutory process for assessing such costs. See I.C. § 42–610.

In this regard, the trial court found:
The Court further finds that prior to the construction of [Hulet's] dam there was little, if any, need for a water master on Sinker Creek. The Court finds that because of [Hulet's] construction of the dam and refusal to pass through the run off waters that a water master is necessary. The Court finds that the cost of the water master should be borne by [Hulet].
Upon this finding, the court reached the conclusion of law that:
Because no costs for watermasters or the administrative costs would be incurred by [Nahas], "but for" [Hulet's] dam, this Court holds that any such watermaster or other administrative costs incurred by [Nahas] to enforce [Nahas'] rights under this decree shall be borne exclusively by [Hulet].
In its judgment, after stating the water rights to which Nahas was entitled, the court ordered:
All water master costs and administrative costs incurred pursuant to this judgment shall be borne exclusively by [Hulet].
Arguably, the court's order was designed to induce Hulet to avoid interfering with Nahas' water rights and, if that failed, to place the economic burden of the water-

master upon Hulet. However, the statute, I.C. § 42–610, does not provide for such relief. The statute requires that the cost of a watermaster, incurred in the enforcement of water rights, "shall be a charge against the land of the users to which said water was so delivered." Nahas may have an action over against Hulet to recover the cost of a watermaster after water is delivered to Nahas as a result of the efforts of a watermaster. But first those costs must be assessed against Nahas. The portion of the court's judgment which requires direct assessment of those costs against Hulet (contemplating future interference with Nahas' rights by Hulet) is premature and therefore inappropriate. The judgment should be modified by deleting the portion which states:
All water master costs and administrative costs incurred pursuant to this judgment shall be borne exclusively by [Hulet].

## V. APPROPRIATION FOR LIVESTOCK WATERING

In addition to determining the priority of his right to divert winter runoff water to fill his lake in preparation for summer irrigation, Nahas sued to establish his appropriation for livestock watering directly from Sinker Creek. The court, in determining the rights of the parties, recognized Nahas' appropriation for in-stream watering of livestock. Hulet argues that because Nahas did not "divert" water from Sinker Creek to water his cattle, but rather allowed his cattle to drink directly from the stream, Nahas' right to stockwater can not be recognized and enforced by the trial court.

It is true that Idaho's statutory scheme regulating the appropriation of water contemplates an actual physical diversion. See State, Department of Parks v. Idaho Department of Water Admin., 96 Idaho 440, 530 P.2d 924 (1974). A substantial body of case law generally supports that requirement. E.g., Hidden Springs Trout Ranch v. Hagerman Water Users, Inc., 101 Idaho 677, 619 P.2d 1130 (1980), citing Sarret v. Hunter, 32 Idaho 536, 541,

185 P. 1072, 1074 (1919); *Olson v. Bedke,* 97 Idaho 825, 555 P.2d 156 (1976); *Parke v. Bell,* 97 Idaho 67, 539 P.2d 995 (1975), citing *Nielson v. Parker,* 19 Idaho 727, 115 P. 488 (1911); *Cantlin v. Carter,* 88 Idaho 179, 397 P.2d 761 (1964); *Maher v. Gentry,* 67 Idaho 559, 186 P.2d 870 (1947); *Furey v. Taylor,* 22 Idaho 605, 127 P. 676 (1912); *Sandpoint Water & Light Co. v. Panhandle Dev. Co.,* 11 Idaho 405, 83 P. 347 (1905). However, we are aware of only one case in which the issue of priority of competing users, some of whom used their water in-stream for livestock watering and without physical diversion, was decided. In *Stevenson v. Steele,* 93 Idaho 4, 453 P.2d 819 (1969), the Idaho Supreme Court stated that "under ... the general water law of this State ... [an] appropriation ... for winter watering of stock is [a beneficial use] entitled to the protection afforded by law." 93 Idaho at 11, 453 P.2d at 826.

In *Stevenson,* the plaintiffs had sought and obtained an injunction prohibiting the defendant Steele from pumping water from his well because it interfered with the plaintiffs' superior water rights. The water rights which were protected included water rights for irrigation, domestic water use, and stock watering. Though the court's opinion does not reflect it, the transcript of the district court hearing in that case clearly shows that some of the plaintiffs had not diverted water for the purpose of livestock watering, but had allowed their stock to drink from streams running through their property. In effect, the Idaho Supreme Court protected water rights which were appropriated for stock watering but in which no physical diversion took place. To support its conclusion that an "appropriation ... for winter watering of stock is entitled to the protection afforded by law," the court cited *Cottonwood Water and Light Co. v. St. Michael's Monastery,* 29 Idaho 761, 162 P. 242 (1916); *Town of Genoa v. Westfall,* 141 Colo. 533, 349 P.2d 370 (1960); *Adams v. Portage Irrigation, etc. Co.,* 95 Utah 1, 72 P.2d 648, 655 (1937); and *Steptoe Livestock Co. v. Gulley,* 53 Nev. 163, 295 P. 772 (1931). In *Genoa, Adams* and *Steptoe Livestock,* appropriations of water to water livestock without a diversion were recognized. Using these cases as authority for recognizing the right of the plaintiffs in *Stevenson* to water livestock without using a diversion, appears to be more than coincidental.

In the trial below, Nahas presented evidence that his predecessors in interest had acquired decreed rights in Sinker Creek, many years before, for irrigation, domestic use and *stock watering.* The trial court did not mention these decreed rights in its findings of fact, conclusions of law, or judgment and decree. Neither party relies on these decreed rights in its arguments. No limits as to the time of year during which these rights could be exercised is apparent from the decree, but other parts of the record indicate that the scope of adjudicated rights was limited to the irrigation season. The issue here is winter watering rights; but we mention these decreed rights because they illustrate a right, recognized by the trial court, to use water for stock watering without a physical diversion.

We must also consider the practical realities of raising livestock in this state. We think it unlikely that a rancher would divert water from a stream running through his property for livestock watering when the same result is achieved without effort simply by allowing livestock to drink directly from the stream. To link recognition of an appropriation for livestock watering to the existence of a diversion could very well jeopardize stock watering rights of ranchers who have watered stock directly from streams or springs for decades. Finally, we cannot justify imposing an economic burden, by requiring a diversion, which will not advance the interests of the public by promoting more efficient use of water, or reducing waste. We conclude that, for purposes of watering stock, no diversion from a natural watercourse should be required to establish a constitutional appropriation of water. This is not to say that the Department of Water Resources might not reasonably impose a requirement for the use of physical diversion or measuring devices. Such a requirement could serve a valid reg-

ulatory purpose by aiding the department in determining the location and quantity of water use. We simply hold that, for the purpose of establishing the existence of a stock watering right by the constitutional method of appropriation, a diversion device is not required.

Hulet also challenges the size of the water right which was recognized by the court for purposes of stock watering. Hulet argues that the size of the appropriation of water for stock watering should be controlled by guidelines of the Department of Water Resources, and that the court failed to consider the effect of the number of stock on the size of the appropriation. However, these guidelines are for the use of the department in determining whether the amount of a proposed use of water is reasonable. Nahas presented several witnesses who testified concerning the amount of water which Nahas required for winter stock watering. These witnesses indicated that between 10 and 20 miner's inches were required to satisfy Nahas' stock watering needs. The court awarded 12 miner's inches for stock watering, concluding that this water need is supplied by the existing springs recharging Sinker Creek below Hulet's dam. Substantial competent evidence supports this finding. It will not be disturbed on appeal.

## VI. DAMAGES

Hulet argues that no damages, actual or punitive, should be awarded in this case. However, we need not reach the merits of that argument in this appeal. As noted, determination of the issues framed by the pleadings was separated into two trials, one to determine the rights of the respective parties, and a second to determine the issue of damages. This appeal was taken from the judgment entered following the first trial in accordance with I.R.C.P. 54(b). The rule 54(b) certificate states in part that "[w]ith respect to the issues determined by the above judgment ... an appeal may be taken." The court stated in its judgment that "plaintiffs *may* be entitled to punitive damages. The court, however, *reserves judgment* on this issue. [This] reservation of judgment ... shall ... not [affect] the finality of the remainder of this judgment." [Emphasis supplied.] It is clear that the district court did not intend to certify for appeal any question concerning damages. As the determination of the issue of damages has not been made, the issue of what, if any, damages are appropriate in this case is not ripe for review. Because this was not one of the issues certified or certifiable under rule 54(b), we will not consider it on this appeal.

## VII. REQUEST FOR ATTORNEY FEES ON APPEAL

Nahas requests attorney fees on appeal. The Idaho Supreme Court has determined that attorney fees on appeal will not be awarded unless the appellate court is left with an abiding belief that the appeal was brought or pursued frivolously, unreasonably or without foundation. *Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 591 P.2d 1078 (1979). This appeal presented a genuine issue of law concerning the applicability of the diversion requirement to a constitutional appropriation of water for stock watering. We are not left with the abiding belief that this appeal was brought frivolously, unreasonably or without foundation. We will not award attorney fees on this appeal.

The case is remanded for further proceedings consistent with this opinion. Costs to respondents, Nahas.

SWANSTROM and BURNETT, JJ., concur.